FILED

January 26, 2017

TN COURT OF
WORKERS' COMPENSATION
CLAIMS

Time 1:21 PM



## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MEMPHIS

| | | |
|---|---|---|
| KINE GUEYE, | ) | Docket No.: 2016-08-0701 |
| Employee, | ) | |
| v. | ) | State File No.: 29588-2015 |
| | ) | |
| FEDERAL EXPRESS CORP., | ) | Judge Robert Durham |
| Employer, | ) | |

---

## EXPEDITED HEARING ORDER DENYING BENEFITS

---

This cause came before the undersigned Workers' Compensation Judge on January 11, 2017, upon the Request for Expedited Hearing (REH) filed by, Kine Gueye. Given that Federal Express stipulated Ms. Gueye sustained a compensable low back injury on April 9, 2015, for which she is entitled to reasonable medical treatment, the dispositive issue is whether Ms. Gueye's complaints of muscle weakness, paresthesia, dizziness, ataxia, and "brain compression" causally relate to this work injury. The Court holds Ms. Gueye did not provide sufficient evidence to establish she is likely to prevail at a hearing on the merits that these complaints arose primarily out of and in the course of her employment.

### History of Claim

Ms. Gueye, a thirty-seven-old native of Senegal, began working for Federal Express on March 27, 2015. On April 9, 2015, Ms. Gueye was unloading boxes from a conveyor belt when a number of boxes coming down the belt forced her backwards, causing her to fall onto a box and injure her low back. Ms. Gueye reported the incident, and Federal Express provided a panel from which she chose Dr. Jeffrey Lowery. (Ex. 6 ;Ex. 3 at 23.) Dr. Lowery diagnosed Ms. Gueye with a lumbar strain with numbness, placed her on restricted duty, and recommended she see an orthopedist. (Ex. 3 at 24.)

Federal Express provided a panel of orthopedists, and Ms. Gueye chose Dr. Arsen Manugian. (Ex. 7.) Dr. Manugian noted Ms. Gueye complained of low back pain

1

without radiation. He also noted she had a history of Bell's Palsy and complaints of a headache as well as numbness or tingling and weakness in her arms and/or legs. Ms. Gueye testified that she informed Dr. Manugian she also suffered from neck pain, although the record does not note it. Dr. Manugian diagnosed her with a lumbar sprain, ordered physical therapy, and placed her under several work restrictions. (Ex. 3 at 26-27.)

On May 1, the physical therapist noted Ms. Gueye's "back and neck pain actually feel much better," and Ms. Gueye stated she was ready to return to work. (Ex. 3 at 43.) Dr. Manugian released Ms. Gueye to return to regular duty on May 4. She returned a week later complaining of increased low back pain with radiation into her right buttock and thigh. Ms. Gueye stated, as she also testified at the hearing, that she suffered increased pain following a heavier workload upon her return to regular duty. Dr. Manugian placed her back under work restrictions and ordered a lumbar MRI. (Ex. 3 at 48.) The MRI revealed unilateral L5 spondylosis without spondylolisthesis or foraminal stenosis, a mild disc bulge at L4-5, and a small lesion on the right iliac bone adjacent to the S1 joint that suggested a benign cyst. (Ex. 3 at 52.)

Dr. Manugian noted he attempted to explain to Ms. Gueye that the spondylolysis pre-existed her work injury. He recommended a bone scan of the lumbar spine to determine if there was any "obvious activity" that revealed an acute injury. (Ex. 3 at 53.) The bone scan showed normal uptake and no focal lesions in the lumbar spine, pelvis, or sacroiliac joints. (Ex. 3 at 50.)

Ms. Gueye returned to work. She testified that on June 10, a loud noise startled her and she thought something was going to fall on top of her. She ran away and immediately began suffering from severe neck and back pain. She notified her supervisor, who arranged for her to be taken to the emergency room, where she was treated for back and leg pain. (Ex. 3 at 54.) The following day, Ms. Gueye returned to Dr. Manugian, where she explained that, after running, she experienced "shivering" in both legs, but by the time she actually saw a physician at the emergency room, the spasms had resolved. However, she was still experiencing low back pain, and she reiterated she did not have any problems prior to her work injury. (Ex. 3 at 59.)

Dr. Manugian noted he had "great difficulty" persuading Ms. Gueye that, while she suffered a resolving back strain on April 9, the spondylosis pre-existed her injury and was not active. He further stated the leg symptoms that precipitated her emergency room visit were not directly related to her back injury, and Ms. Gueye had a hard time accepting this as well. (Ex. 3 at 60.) Dr. Manugian saw her again on June 25. Ms. Gueye complained of pain in her low back that extended into her mid-back and cervical area. Dr. Manugian noted no radicular signs and stated she had no impairment and could return to work at regular duty. He further stated he did not need to see her again on a regular basis. (Ex. 3 at 61.)

2

On July 17, without authorization from Federal Express, Ms. Gueye saw her primary care physician, Dr. Jewel Harris, who wrote a note stating that Ms. Gueye suffered from pain and weakness in her thighs that was "likely related to recent back injury." Dr. Harris took Ms. Gueye off work from July 17 through July 30 and continued physical therapy. (Ex. 6 at 73-74.) Federal Express authorized Ms. Gueye to return to Dr. Manugian. He again noted no objective abnormalities regarding her low back, and he recommended she return to regular duty, but if she could not do that, to find less strenuous work. He repeated he did not need to see her on a regular basis. (Ex. 6 at 78.)

Ms. Gueye then returned to Dr. Harris on her own, who kept her off work and referred her to Manuel Carro, a neurologist. (Ex. 6 at 80.) At his evaluation, Dr. Carro noted Ms. Gueye complained of a history of migraines, low back pain and "burning dysesthesias" in her feet, as well as numbness in her extremities. Dr. Carro ordered x-rays and a nerve conduction study of her lower extremities. (Ex. 6 at 81-83.) Afterwards, Dr. Carro noted the nerve conduction studies were normal and the lumbar x-rays did not reveal any instability. He recommended medication and additional physical therapy for chronic back pain. (Ex. 6 at 85-86.)

On October 28, Ms. Gueye underwent a brain CT scan following an unauthorized ER visit due to complaints of severe headaches and right-sided neck pain. The CT scan showed no acute findings and no changes were noted when compared to one taken in March 2015. However, a cervical spine CT scan did reflect a possible Chiari I malformation in the cerebellum. (Ex. 6 at 91-93.)

Ms. Gueye was then referred to Dr. Jason Weaver, a neurosurgeon, to evaluate the possible Chiari I malformation. Dr. Weaver noted Ms. Gueye complained of suboccipital headaches and occasional numbness and tingling in her arms, as well as low back pain and a host of other physical complaints. Dr. Weaver found no abnormalities on exam and ruled out a Chiari malformation but stated that her cerebellar tonsils accounted for the perceived abnormality. He found no reason for surgery but referred her to another neurologist, Dr. Lihong Shen. (Ex. 6 at 96-97.)

Dr. Shen noted Ms. Gueye claimed to have a long history of "mild headaches" but developed "severe headaches" a few months earlier. She also complained of continued low back pain that radiated to her thighs and caused weakness and tremors, as well as numbness from her mid-calves to her feet. Dr. Shen felt her headaches were consistent with a Chiari malformation and noted she could suffer from carpal tunnel syndrome, but could not explain Ms. Gueye's weakness complaints. (Ex. 6 at 101.) She ordered an NCS, which was positive for bilateral carpal tunnel syndrome but showed no signs of radiculopathy or myopathy. Ms. Gueye's blood work was normal.

Dr. Shen also reviewed Ms. Gueye's history and noted neurological complaints since 2008. According to a record from Dr. Michael Deshazo dated May 29, 2008, Ms.

Gueye complained of recurrent episodes where she felt like she could not move or talk for up to two hours. Dr. Deshazo noted she had a previous history of Bell's Palsy and observed some of her symptoms were "very unusual." (Ex. 6 at 113.) He ordered an MRI that revealed no significant abnormalities. (Ex. 6 at 118.) In 2012, Ms. Gueye treated with Dr. Yaohui Chai for intermittent right facial twitch, headaches and neck pain. Upon review, Dr. Shen noted Ms. Gueye's 2012 MRI showed Chiari features similar to the ones in the 2015 MRI. Ms. Gueye told her she did not have any muscle weakness in 2012, but it started in her legs after her fall in April 2015 and spread to her arms a few weeks later. Dr. Shen ordered additional tests, which were negative. (Ex. 6 at 121.)

Ms. Gueye was referred to another unauthorized neurologist, Dr. Tulio Bertorini, on March 11, 2016. After an exam and file review, he felt her symptoms might be non-organic in nature, and found her neurologic exam to be unremarkable. (Ex. 6 at 145.) Ms. Gueye returned to Dr. Shen and stated her headaches were much better, but her limb weakness remained the same. Dr. Shen stated Ms. Gueye's Chiari formation was "definitely contributing" to her headaches. (Ex. 6 at 167.) On September 1, 2016, Dr. Bertorini wrote a letter stating he evaluated Ms. Gueye following her fall at work with "boxes falling on her," and she had several complaints, but there was "no clear anatomical cause for this." He stated these symptoms began with the work accident. Ex. 6 at 170.

Ms. Gueye testified she now suffers from symptoms involving headaches, back and neck pain, and generalized weakness and numbness that she did not have prior to her work injury. these conditions keep her from being physically active and create difficulty concentrating. She testified she complained of neck and back pain from the outset. She also had headaches, which could be attributable to the accident. Federal Express introduced an MRI taken on March 8, 2015, two weeks before Ms. Gueye began working for Federal Express, because of complaints of headaches, right-sided facial droop and slurred speech. (Ex. 3 at 22.) Despite this record, as well as the records from 2008 and 2012, Ms. Gueye denied she had any neurologic problems, other than Bell's Palsy prior to her work-related injury.

### Findings of Fact and Conclusions of Law

Ms. Gueye has the burden of proof on all essential elements of her workers' compensation claim. *Scott v. Integrity Staffing* Solutions, 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015).

Ms. Gueye need not prove every element of her claim by a preponderance of the evidence in order to obtain relief at an expedited hearing. *McCord v. Advantage Human Resourcing*, 2015 TN Wrk. Comp. App. Bd. LEXIS 6, at *7-8, 9 (Mar. 27, 2015). At an expedited hearing, she has the burden to come forward with sufficient evidence from which the trial court can determine she is likely to prevail at a hearing on the merits. *Id.*

4

Applying these standards, Federal Express does not dispute Ms. Gueye's contention that she suffered an injury to her low back on April 9, 2015, and it agrees to provide future medical care for that injury as ordered by Dr. Manugian. However, Dr. Manugian has released Ms. Gueye to return to work with no restrictions or impairment, opining that she has fully recovered from the low back strain causally related to her work injury. Thus, the question is whether Ms. Gueye has established she is likely to prevail in proving her other complaints causally relate to her work injury, thus entitling her to workers' compensation benefits for those conditions. *McCord* at 7-8, 9. Upon review of the record, the Court holds the evidence presented by Ms. Gueye is insufficient to do so.

In order to establish causation, an employee must prove "to a reasonable degree of medical certainty that [the injury] contributed more than fifty percent (50%) in causing the death, disablement or need for medical treatment, considering all causes." Tenn. Code Ann. § 50-6-102(14)(C) (2016). The term "reasonable degree of medical certainty" means that, "in the opinion of the physician, it is more likely than not considering all causes, as opposed to speculation or possibility." Tenn. Code Ann. § 50-6-102(14)(D) (2016). Thus, causation must be established by expert medical testimony, and it must be more than "speculation or possibility" on the part of the doctor. *Id.*

Ms. Gueye does not dispute that Dr. Manugian is an authorized doctor, and thus his opinion on causation is entitled to a presumption of correctness that can only be rebutted by a preponderance of the evidence. Tenn. Code Ann. § 50-6-102(14)(E) (2016). His opinions only reference Ms. Gueye's low back and leg complaints. With regard to these conditions, he concluded that her underlying spondylolysis pre-existed her work injury and there was no evidence of an acute injury to her lumbar spine. He also concluded her current complaints of leg weakness do not directly relate to the work injury.

Regarding Ms. Gueye's numerous other complaints, Dr. Manugian's records do not specifically address them. However, she testified she told him about suffering from these conditions. Her testimony is somewhat corroborated by Dr. Manugian's records, as well as those from physical therapy, which make oblique references to headaches, numbness and neck pain. This evidence tends to bolster Ms. Gueye's argument that she is at least entitled to receive a panel of physicians for diagnosis and possible treatment of these conditions. *See*, Tenn. Code Ann. § 50-6-204 (2016).

However, the Court finds this evidence alone is insufficient to establish Ms. Gueye is likely to prevail at trial even with regard to the provision of a panel of physicians. Medical evidence is generally required in order to establish a causal relationship, "[e]xcept in the most obvious, simple and routine cases." *Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 638, 643 (Tenn. 2008). In Ms. Gueye's case, a number of physicians treated her, including three neurologists and a neurosurgeon, subsequent to her release by Dr. Manugian, and subjected her to a multitude of tests and evaluations. The only physician

5

to address a causal connection between her condition and her work injury is Dr. Bertorini. He stated she had several complaints but there was "no clear anatomical cause for this." He further stated these symptoms began with the work accident; however, even if true, this is far from proving Ms. Gueye is likely to prevail at trial in proving these complaints primarily arose out of and in the course and scope of her work-related accident.

Moreover, Federal Express introduced evidence that casts doubt upon her assertion that her symptoms only began after April 9, 2015. Although Ms. Gueye adamantly denied any neurologic symptoms other than Bell's Palsy prior to her work injury, she complained of temporary paralysis and other "unusual complaints" in 2008. In 2012, she complained of "intermittent facial twitching, headaches and neck pain," for which she underwent a brain MRI. Finally, only a few weeks before she began working for Federal Express, Ms. Gueye visited the ER complaining of facial drooping, headaches, and slurred speech. While Ms. Gueye maintains these symptoms were due to Bell's Palsy, there is no medical evidence to confirm her assertions, or indeed establishes she even suffers from Bell's Palsy.

Finally, Ms. Gueye emphasized during her argument that her post-injury brain MRI reveals "brain compression"[1] that was not in the 2012 MRI and that Dr. Shen definitely attributed her headaches to the Chiari 1 malformation. However, Dr. Shen stated she noted the same "Chiari features" when reviewing the 2012 MRI film. Furthermore, Dr. Weaver, a neurosurgeon, opined she did not suffer from a Chiari I malformation. However, even if she does, no physician has opined that the "brain compression" resulted from her work injury.

At this point, Ms. Gueye has only offered speculation and conjecture as to the cause of her numerous symptoms, which cannot serve as justification for the provision of benefits. *See Shelton v. Torrington Co.,* No. 01501-9704-CV-00092, 1998 Tenn. LEXIS 107995, at *10 (Tenn. Workers' Comp. Panel Mar. 13, 1998) (citing *Reeser v. Yellow Freight*, 938 S.W.2d 690, 692 (Tenn. 1997)).

Therefore, Ms. Gueye may seek further treatment from Dr. Manugian for her work-related low back strain incurred on April 9, 2015 if she and Dr. Manugian feel it is reasonable and necessary that she do so. However, the Court holds at this time that Ms. Gueye is unlikely to prevail at a hearing on the merits in proving that her other current complaints arose primarily out of and in the course and scope of her employment with Federal Express.

**IT IS, THEREFORE, ORDERED** as follows:

1.    With the exception of any reasonable and necessary medical treatment Ms. Gueye

---

[1] The Court assumes this refers to the "Chiari 1 malformation" noted in the 2015 MRI.

may require from Dr. Manugian for her work-related low back strain incurred on April 9, 2014, Ms. Gueye's request for workers' compensation benefits is denied at this time.

2. This matter is set for a Scheduling Hearing/Status Conference on March 8, 2017, at 2:00 p. m. C.T.

**ENTERED THIS THE 26TH DAY OF JANUARY, 2017.**

Robert V. Durham, Judge
Court of Workers' Compensation Claims

**Scheduling Hearing/Status Conference:**

A Scheduling Hearing/Status Conference has been set with Judge Robert Durham, Court of Workers' Compensation Claims. You must call 615-253-0010 or toll-free at 866-689-9049 to participate in the Hearing.

Please Note: You must call in on the scheduled date/time to participate. Failure to call in may result in a determination of the issues without your further participation. All conferences are set using Central Time (CT).

**APPENDIX**

Exhibits:

1. Letter from Bertorini
2. Ms. Gueye's affidavit
3. Medical records submitted by Federal Express
4. New Hire Orientation Class Form
5. Denial Letter from Sedgwick James
6. Medical records submitted by Ms. Gueye
7. Initial C-42 form
8. Second C-42 form
9. Return to work form provided by PCS
10. Accident Report
11. Wage Statement
12. Mileage Statement
13. First Report of Injury

Technical Record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Federal Express' Position Statement

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Expedited Hearing Order Denying Benefits was sent to the following recipients by the following methods of service on this the 26 th day of January 2017.

| Name | Certified Mail | Via Fax | Via Email | Service sent to: |
|------|------|------|------|------|
| Kine Gueye | X | | X | 10407 Redmond Drive Cordova, TN 38016 Kinegueye7@gmail.com |
| Jonathan May | | | X | gtaylor@lewisthomason.com |

Penny Shrum, Clerk of Court
Court of Workers' Compensation Claims
WC.CourtClerk@tn.gov

8